OPINION OF THE COURT
Edward J. Greenfield, J.
“Things are not always what they seem.” To what lengths must an investigator go to attempt to pierce the mask of pretense and uncover reality?
This case involves a novel question of whether a credit investigating agency can be held liable for failure to discover and report to its client the criminal record of the person being investigated, who had been given a new identity under the Federal Witness Protection Program.
This case involves the tale of a man who appeared to be a business genius and who was able to attract both sales and investment capital with great success, until it was disclosed that he had, in fact, been a major advisor and financial manipulator for the underworld before he re-channeled his efforts into legitimate business. Disclosure caused consternation, and when the guiding spirit of the business enterprise was removed, the structure he had built collapsed in ruins.
*986 Plaintiff, Clarion Capital Corporation, previously known as Creative Capital (hereinafter CCC), was a venture capital company investing in small businesses. In this case, it is suing Proudfoot Reports Incorporated, a commercial investigative agency which makes reports on credit worthiness and the reputation and background of persons or corporations, claiming that the defendant was guilty of breach of its agreement, intentional deception or gross negligence resulting in damages of $4,500,000.
At the nonjury trial, the evidence disclosed and the court found:
In May of 1971, CCC had loaned $100,000 to the Alvin Duskih Company, a California manufacturer of ladies sportswear, which had been having financial difficulties. One Paul Maris, an energetic go-getter who was the company’s treasurer, took over control of the company, became its president and changed its name to Paul Maris Co. Under his direction, the sales volume grew rapidly, and CCC stood by to finance its growth. By July of 1972, CCC had put $1,300,000 into the rapidly expanding company. At that time, a new group acquired control of CCC, renewed its accounts and seeking to regularize and standardize its files and procedures, requested a routine investigative and background report on Paul Maris, the principal of the company, for which CCC had put up loans and equity capital, and which represented CCC’s largest outstanding risk capital.
On July 10, 1972, Mr. Regáis, an officer of CCC, called the Proudfoot Agency, the defendant herein, and asked for a background report on Paul Maris. Regáis was told that the price for the report was $250 and that the report would be completed in about two weeks.
The investigator assigned to do the job called Maris in California to get his vital statistics, his educational background, his military service record and his business references. Maris told him that he had been born in Philadelphia, went to college in Ohio and thereafter was in the armed forces from 1958 to 1970 as a cryptographer. Thereafter, he said he had been with the United States Atomic Energy Commission as an analyst until he joined the Alvin Duskin Company in 1971.
*987 The investigator verified Maris’ college degree, but recognizing the difficulty in verifying his military background, since Maris told him that he had been working in highly secret cryptographic and atomic energy posts, he made no attempt to check it out further. He contacted seven people with regard to Maris’ business background and business references, all of whom reported favorably. He had not been asked to do a credit check. Having uncovered no inconsistencies or derogatory information, he proceeded to write up a favorable report and it was duly forwarded to CCC on July 21, 1972.
The report stated that Paul Maris had been born in Philadelphia, January 12, 1935; he graduated from John Bertram High School in that city in 1953; that he graduated from Baldwin-Wallace College in Ohio in 1957; that he entered the United States Army in 1958 and after service as a cryptology and analysis officer, left the service with the rank of major; and had also been employed by the United States Department of State and by the Atomic Energy Commission. The report then stated what was already known to CCC — that Maris joined the Duskin Company in 1971 and turned it around. Banking sources said he was an up and coming executive, a person of honor, integrity and business acumen. Other business contacts likewise reported general admiration for his business ability and character. The report concluded, “nowhere in the conduct of this inquiry was anything learned or developed which would reflect unfavorably upon the business or personal background of the subject.”
Reassured, CCC continued advancing money for the company’s needs. It claims to have invested an additional $1,800,000 after receipt of the Proudfoot report. After some time however, the officials at CCC were unhappy that even with the desired ever-rising sales, the Maris Company was still not making a profit. CCC, which now controlled the stock, tried to dismiss Maris in January of 1973. Maris threatened to pull out all the personnel, and CCC, in order to avoid a total closedown, was compelled to rehire him. In March of 1973, CCC tried to replace Maris with a new chief executive officer and limit Maris’ function to marketing. In *988 response, Maris had all the employees walk out and removed the company’s books and records.
That was the signal for the beginning of litigation. CCC sued to regain possession of the company and its records, and Maris countersued for breach of contract. It was during the course of the litigation that the truth came out. An investigator engaged by CCC recognized Maris as someone he had encountered in a criminal trial in New Jersey. It was then disclosed that Maris was in reality Gerald Martin Zelmanowitz, a former financial advisor to members of the Mafia, who had been convicted for dealing in stolen securities. He had then testified for the Government in a trial in New Jersey against Angelo (Gyp) De Carlo and others. In jeopardy for having co-operated with the Federal Bureau of Investigation (F.B.I.) and having appeared as a Government witness, Zelmanowitz was then given a new identity, complete with corroborating papers, and relocated to California under the Federal Witness Protection Program. In California, as Paul Maris, he attempted to start afresh in legitimate business.
The question here presented is whether Proudfoot, as an investigative agency, had an obligation to break through the new identity which had been provided by the Federal Government, and whether on its failure to do so, it will be liable to its client for all of the client’s financial outlays. Plaintiff contends that because of the failure of the report, for which it paid $250, to disclose the entire truth, it is entitled to recover damages of $4,500,000. Plaintiff contends that a more thorough investigation would have revealed that there was no birth record for Paul Maris in Philadelphia, that there was no record of Maris’ attendance at John Bertram High School and that although the registrar of Baldwin-Wallace College verified that Maris had been awarded a degree in 1957, the investigator had failed to obtain a written confirmation of that fact. The Proudfoot investigator also had obtained no record of Maris’ service with the United States Army, Department of State and the Atomic Energy Commission. It is plaintiff’s contention that because Proudfoot had failed to conduct a more comprehensive examination, and relied upon Paul Maris’ own statements as to his background, that *989 Proudfoot breached its contract to provide a detailed background report and that it would be entitled to recover either for such breach of contract, for the negligence of Proudfoot in failing to uncover the truth, and for fraud. Plaintiff seeks recovery not only for its entire lost investment in the Paul Maris Company, but also asks for punitive damages of $3,000,000.
One of the claims of plaintiff against Proudfoot is for fraud. Fraud is established if there has been misrepresentation of a material fact, the representation was false and uttered with an intent to deceive, and plaintiff relied on the misrepresentation to its detriment and sustained damages.
On the facts here a claim for fraud cannot be substantiated. Undeniably, the statements about the background of Mr. Maris were false. Were they material? It would not appear that it would have made any difference to plaintiff if it knew Maris was not born in Philadelphia or educated at John Bertram High School. His alleged college record and military background were secondary to reports from business and banking contracts. The central falsity related to Marris’ identity. Even if plaintiff knew his true name was Zelmanowitz it would probably have made no difference. It was the nondisclosed fact that their client was a convicted bond thief with Mafia connections that might have altered their decision to continue financing his company. Defendant merely reported such biographical “facts” as were given to it, and concluded, accurately enough, “Nowhere in the conduct of this inquiry was anything learned or developed which would reflect unfavorably upon the business or personal background of the subject.”
In other words, defendant was duped and misled, as was the plaintiff, and the record is entirely devoid of anything to indicate the necessary element of scienter — knowledge of falsity and an intent to deceive. The only basis for recovery in fraud absent knowledge of falsity is that expressed in the touchstone case of Ultramares Corp. v Touche (255 NY 170, 186): “Scienter has been declared to be an indispensable element except where the representation has been put forward as true of one’s own knowledge (Hadcock v. Osmer, 153 N. Y. 604), or in circumstances *990 where the expression of opinion was a dishonorable pretense”. In Chief Judge Cardozo’s memorable words, “Fraud includes’ the pretense of knowledge when knowledge there is none.” (Supra, p 179.) But, “if there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by the contract”. (Supra, p 189.)
Thus, a certified statement by accountants which is not in accordance with the facts may give rise to a cause of action for fraud, for accountants “by the very nature of their calling profess to speak with knowledge when certifying to an agreement between the audit and the entries.” (Supra, p 191.) In a similar position are lawyers certifying the validity of municipal or corporate bonds, title companies certifying as to the ownership of land who are wholly answerable for their mistakes, and others who are in a position to ascertain the exact truth, and for a fee warrant the correctness of their assertions.
Such a situation is not presented here, however. Defendant was not engaged to certify the biographical background of the subject to be investigated. The “truth” which it reported was not the underlying hard rock of fact known only to God and the F.B.I., but what was generally known, understood, reported and believed about Paul Maris by those acquainted with him — in other words, his business and personal reputation. As anyone who has ever tried a criminal case will know, there is sometimes a vast gulf between the character witnesses’ laudatory opinion of the subject’s reputation for honesty, integrity and peaceableness, and the facts unknown even to the lawyer and the spouse, which are ultimately brought to light after extended and painstaking investigation and scrutiny. There appears in this case neither knowledge by defendant of the inaccuracy of its report, nor an unwarranted pretense of knowledge. Hence, there can be no recovery for fraud.
The claim against defendant for negligence for having relayed incorrect facts is premised upon the obligation a third party may have to correct the misstatements of another if it has an obligation to report the truth, and the truth is within its power to ascertain. Plaintiff relies on the *991 classic cases of Glanzer v Shepard (233 NY 236) and International Prods. Co. v Erie R.R. Co. (244 NY 331). In the Glanzer case, the defendant, a public weigher, was held liable to the plaintiff for the sum which was overpaid on defendant’s incorrect certification of the weight of beans being sold by a shipper. The court, per Judge Cardozo, declared (p 239): “It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all”. The defendants were held (p 241) “not merely for careless words * * * but for the careless performance of a service”. “Diligence was owing”, said the court (p 242), “to him * * * who relied”. Similarly, in the International Prods, case (supra), defendant, a common carrier, was held liable for having informed plaintiff, incorrectly as it turned out, as to the storage place of certain goods, as a result of which the actual location where the goods were destroyed by fire was not covered by insurance. The criteria for liability based upon alleged misreporting of facts is there, set forth (p 338): “Liability * * * arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge or its equivalent that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that if false or erroneous he will because of it be injured in person or property. Finally the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care * * * [I]n a proper case we hold that words negligently spoken may justify the recovery of the proximate damages caused by faith in their accuracy * * * [E]ach case must be decided on the [basis of the] peculiar facts presented.”
On the unique facts presented in this case, I fail to discern any negligence. Unlike the public weigher, the title searcher, or the certifying accountant, a credit investigator gives no warranty of truth as to its report. There may well be underlying facts it has not discovered, but it does not follow that a failure to discover constitutes negli *992 gence. For its $250 fee, defendant could reasonably be expected to report the current reputation of the subject, and the ascertainable facts about the financial condition of his company. It could not reasonably be expected to conduct an independent audit of the company’s books, nor could it be expected to perform as an implacable Javert, uncovering all the well-concealed secrets of the subject’s past. This is especially so when the subject had been given a new identity by the Federal Witness Protection Program, and had arranged to make it difficult for anyone making inquiry to pierce the shield erected between past and present. The military record supplied to account for missing years in the witness’ life was entirely of service in secret installations which would not be readily verifiable by outsiders.
I find that defendant breached no standard of reasonable care when, in the course of drawing up its report it did not check the birth records, the high school record, or the military record of the subject. It had no legal duty to ascertain that Paul Maris, business whiz, was in reality Gerald Martin Zelmanowitz, former Mafia fixer and financial adviser to the underworld.
The claim for breach of contract is likewise premised on defendant’s alleged failure to exercise reasonable care and skill in the performance of the work required to be done by the contract. Since the United States Government had arranged for the world to be fooled as to the identity of the. born-again Paul Maris, the fact that defendant, like everyone else, was not aware of his true identity was no breach of contract. Plaintiff got essentially what it paid its $250 for, a report of Maris’ claimed background, his business standing, and his reputation in the business world. It did not bargain for, nor is it entitled to receive a warranty that its multimillion dollar investment in Maris’ company was as sound as Gibraltar. It certainly is not entitled to recover punitive damages for “gross fraud” or “morally culpable conduct.”
Upon the foregoing findings and conclusions, the court directs entry of judgment for defendants.